# EXHIBIT 4



# Droit de la famille — 182456, 2018 QCCS 5067 (CanLII)

| | |
|---|---|
| Date: | 2018-11-26 |
| File number: | 540-04-013860-173; 540-12-021501-176 |
| Citation: | Droit de la famille — 182456, 2018 QCCS 5067 (CanLII), <https://canlii.ca/t/hw8tj>, retrieved on 2025-11-25 |

**Droit de la famille — 182456**                                          **2018 QCCS 5067**

# SUPERIOR COURT
### Familial Division

CANADA
PROVINCE OF QUEBEC
DISTRICT OF        LAVAL

No:        540-04-013860-173
            540-12-021501-176

DATE:        November 26, 2018
_____

**PRESIDING:        THE HONOURABLE MICHEL A. PINSONNAULT, J.S.C.**
_____

<u>N°: 540-04-013860-173</u>

**M. J.**
        Plaintiff
v.

**D. A.**
        Defendant

<u>N°: 540-12-021501-176</u>

**M. J.**
        Plaintiff
v.

**D. A.**

    Defendant

_____

### JUDGMENT ON APPLICATIONS TO REVOCATE JUDGMENTS
_____


## OVERVIEW

[1]    Defendant Mrs. D. A. ("**Madame**") has been living in the city of Amman in Jordan since November 2, 2015 with her minor daughter X ([...], 2014), and filed on November 21, 2017 two applications seeking the revocation of judgments rendered by default against her in the two above captioned Court files.

[2]    On May 2, 2017, a first judgment was rendered by Madam Justice Christiane Alary in the Court file bearing number 540-04-013860-173[1] in virtue of which Madam Justice Alary awarded the exclusive custody of X to Plaintiff Mr. M. J. ("**Monsieur**") and ordered Madame to return X to Canada within 10 days (the "**Custody Judgment**").

[3]    On August 8, 2017, a second judgment was rendered by Mr. Justice Pierre Labelle in the court file bearing number 540-12-021501-176[2] in virtue of which Mr. Justice Labelle pronounced the divorce between the parties herein and awarded, *inter alia*, the exclusive custody of X to Monsieur (the "**Divorce Judgment**").

[4]    Both judgments were rendered summarily by default in the absence of Madame who at all relevant times was in Jordan since November 2, 2015 and who failed to respond to those legal proceedings.

[5]    Madame is essentially alleging that through no fault of hers, she did not become aware of those proceedings in sufficient time to file any defence or contestation in both matters. But, first and foremost, Madame is contesting the validity of the notifications of the two Originating Applications made by email, adding that all proceedings were drafted in French which she did not understand.

[6]    Madame is therefore seeking the revocation of the Custody Judgment and of the Divorce Judgment as she has a serious defence to offer in both instances.

[7]    It was agreed that both applications in revocation of judgment would be heard at the same time and that the evidence would be common to both matters whenever applicable. A single judgment shall be rendered in connection thereto.

## 1.   CONTEXT

[8]    As previously mentioned, the evidence revealed that all legal proceedings, drafted exclusively in French, were notified to Madame via emails which were also all written in French by Monsieur's lawyer with maybe a single exception for the emails.

[9]    The Custody Proceedings were initiated on April 3rd, 2017 with an Application for child custody in virtue of which Monsieur was seeking the exclusive custody of X who has been living with her mother in Jordan since November 2, 2015, at which time she was one-year old.

[10]    At the outset, on April 3rd, 2017, Monsieur's lawyer obtained the authorization from the Court to serve the Originating Application for child custody to Madam in Jordan via an email address.

[11]     The Application for special mode of service[3] that was supported with a sworn declaration of Monsieur, revealed the following facts:

-     Madame entered into Canada on September 8, 2014 as a permanent resident under the sponsorship of Monsieur;

-     Madame returned to Jordan on November 2, 2015 where she has been living with the minor child at an address that was apparently incomplete or uncertain;

-     « 4. *L'adresse de la défenderesse en Jordain(sic) n'est pas très précise, de sorte que sera très difficile pour la faire signifier en Jordanie*; »

-     « 5. *Le demandeur garde des contacts avec la défenderesse via son courriel :* [...]@yahoo.com *qu'elle consulte quotidiennement, tel qu'il appert de copies d'exemple de ces contacts communiquée(sic) comme pièce P-3;* »

-     « 6. *Il sera impossible au demandeur de procéder à la notification de sa demande pour garde d'enfant et une ordonnance de sauvegarde à la défenderesse, sans l'autorisation du tribunal en lui permettant la notification de cette procédure à la défenderesse par courriel à son adresse courriel :* [...] »

[12]     There is no evidence in the Court file as to what document(s) was(were) actually notified to Madame on April 3rd, 2017 other than an email from Monsieur's lawyer stating:

Bonjour madame D... A...,

Veuillez trouver ci-joint la demande introductive pour garde d'enfant et pour ordonnance de sauvegarde.

Cordialement

Me Fareed Halabi[4]

[13]     The email refers to an attached document in pdf format entitled "*demande introductive d'instance p...our ord.pdf*". However, a copy of said attachment was not provided and filed in the Court file. There is no clear indication as to what document was exactly emailed to Madame, including the decision authorizing the special mode of service via email.

[14]     In fact, the Court file only contains a copy of the notice of presentation page for May 2, 2017 bearing the following handwritten note under Madame's signature: "*The notification I got from the claimant's lawyer.*"

[15]     In any event, upon receiving an email drafted in French from Monsieur's lawyer on April 3, 2017[5], Madame replied:

Dear Mr Fareed Halabi,

I'm sorry I don't speak french, so I didn't understand a word from your email, can you please send it to me in English or in Arabic.

Regards[6]

[16]     The lawyer's reply was curt, but in English this time:

The official language here is French.

If you don't understand get a translator.[7]

[17]     The evidence also revealed that Madame had already initiated legal proceedings in Jordan in 2016 seeking from Monsieur, *inter alia*, alimony for herself as well as for X. Monsieur has been represented with a Jordanian lawyer in the context of those legal proceedings[8].

[18]     Madame testified that upon receiving from Monsieur's lawyer the email written in French which she claimed to not understand, she consulted with her Jordanian lawyer

who was representing her in the Jordanian court proceedings against Monsieur. Her lawyer would have advised her that the service of legal proceedings in Jordan by way of emails was not legal and that she should disregard the same. The Court was informed that like her, Madame's lawyer did not understand French. Claiming to have limited financial resources, Madame did not get the documents translated.

[19]     Madame also indicated that during the short period during which she lived in Canada, she was speaking in Arabic at home and in English in public. She followed on a part-time basis a course offered to immigrants to learn the French language, but it was not sufficient to become familiar with the same. Moreover, since French is not generally spoken in Jordan, she never had the opportunity to practice the same since November 2015.

[20]     At one point in 2017, the police visited Madame to inform her that Monsieur had filed a complaint against her for child abduction. The complaint had come to Jordan via diplomatic channels and she needed to come to the police station to answer questions.

[21]     She attended at the police station with her Jordanian lawyer without any further consequences from the police authorities.

[22]     Afterwards, Madame arranged for verifications to be made in Canada only to discover that two judgments had been rendered against her concerning the custody of X. However, Madame was not overly concerned because the Jordanian courts had awarded her full custody of X.

[23]     In mid-July 2017, Monsieur's Jordanian lawyer caused a notary public to serve a "Notarial Notification" upon Madame, her parents and her siblings, all residing at the same address with her, warning them to return X to Canada as she had unlawfully abducted the child. The "Notarial Notification" also referred to the Custody Judgment simply mentioning that X's custody was awarded to her father. A copy of the Custody Judgment was not attached to the "Notarial Notification" that, incidentally, was written in Arabic with an official English translation[9].

[24]     The same "Notarial Notification" was also published in Arabic in two Amman newspapers on or about July 20, 2017[10].

[25]     Again, Madame sought the advice from her Jordanian lawyer who again reassured her that she had full custody of X under Jordanian law.

[26]     There is no doubt that Monsieur had, at all relevant times, the complete and exact address where Madame and X were residing in Jordan. Moreover, service or notification by bailiff (notary public) was certainly possible as his own Jordanian lawyer had arranged for the service of the aforesaid "Notarial Notification".

[27]     In November 2017, Madame was approached once again by the police informing her that Interpol had issued an international arrest warrant against her for abducting X. She was told that the charges stemmed from the Custody and the Divorce Judgments which were not enforceable in Jordan. Madame reiterated that she could not afford a Canadian lawyer at the time.

[28]     During the few direct written communications from Monsieur to Madame, the same were never made in French.

[29]     Realizing the dire consequences of the Custody and of the Divorce Judgment on legal custody of X, and of great importance, the impossibility to travel outside Jordan given the Interpol international arrest warrant issued at Monsieur's behest, Madame had no other choice but to retain Canadian counsel and file the present applications in revocation in order to have the chance to present her defence to Monsieur's legal proceedings.

[30]     Monsieur testified that he was married to Madame at the same address where he presently resides in Amman, Jordan. He acknowledged that Madame had lived at that address all of her life until her wedding that took place there. It was her parents' residence.

[31]     In an attempt to justify his allegations found in both applications for special mode of service by email, Monsieur testified that while he could find his way to Madame's residence in Amman, he pointed out that the address was not "clear" without elaborating further.

[32]     In fact, his testimony on the question of Madame's "unclear" address in Jordan was evasive at best.

[33]     In preparation for Madame's departure for Jordan with X, Monsieur filled a document entitled "*Lettre de consentement recommandée pour un enfant voyageant à l'étranger*[11] » that he wrote himself (the "**Consent Letter**"). The Consent Letter clearly indicated the complete address where Madame and X were to reside in Amman as well as the telephone number at which she could be reached.

[34]     With convoluted explanations, Monsieur unsuccessfully tried to convince the Court that he had not kept a copy of the Consent Letter as the original and sole copy had been remitted to Madame for her trip. Monsieur claimed that he had not kept a copy of that letter. Therefore, he did not have her "exact" coordinates in Jordan. This was a feeble and unconvincing attempt to justify his two applications for special mode of service via email.

[35]     On the issue of all legal proceedings having been drafted in the French language, Monsieur nevertheless admitted that he had the Custody Judgment translated in English[12] but that he never communicated a copy of the same to Madame.

[36]     Despite not having the "clear" address of Madame in Jordan, Monsieur arranged to send clothes and gifts to X via his own Jordanian lawyers.

[37]     On March 21, 2017, Monsieur's Jordanian lawyer caused a letter of demand written in Arabic to be served (by notarial notification) upon Madame at her Amman address calling for the immediate return of X to Canada, failing which legal proceedings would be instituted[13].

[38]     Yet, despite that the letter of demand clearly showed that it was served by a public notary to Madame at her address by Monsieur's Jordanian lawyer, Monsieur nevertheless argued that his Jordanian lawyer did not know Madame's "exact" address in Amman and, in any event, he did not ask his Jordanian lawyer to provide him with Madame's address for the purpose of serving upon her the Canadian legal proceedings.

[39]     Another significant grey area in Monsieur's testimony is the length of the "temporary" absence of Madame and of X from Canada in 2015.

[40]     Madame argued that due to irreconcilable differences with her then husband, he told her to return to Jordan to live permanently with X. It was never understood, according to Madame, that she was only going for a month and a half long visit with her parents. This would explain the purchase of one-way ticket for Jordan.

[41]     If Madame was only gone temporarily to Jordan from November 2, 2015 for a month and one half, her return to Canada was likely expected by mid-December 2015. Yet, the Consent Letter filled by Monsieur only showed a departure date with no date of return.

[42]     It is somewhat surprising that Monsieur did not take any steps to formally complain about the alleged abduction of X until more than a year thereafter.

[43]     In fact, it rather appears on a *prima facie* basis that the accusation of kidnapping was likely as a form of retaliation to the legal proceedings instituted by Madame in Jordan

in the latter half of 2016 in virtue of which she was seeking, *inter alia*, alimony payments from Monsieur for herself and for X, and bearing in mind that he was represented by a Jordanian lawyer for said legal proceedings instituted months before the Canadian proceedings.

[44]    Why did Monsieur wait from mid-December 2015 until March 2017 to demand the return of X and claim her unlawful abduction by Madame if they were only going to Jordan for a month and a half visit in late 2015?

[45]    Monsieur introduced into evidence a letter dated November 28, 2017 from a daycare center confirming that X was supposed to attend the center commencing on August 26, 2016, but that the parents apparently decided to annul her enrollment just before the beginning[14]. The witness who came to testify at Monsieur's request ignored who had filed the application for X's enrollment nor the date of said application that, in any event, she did not have with her. Moreover, the witness had never met with either Madame or Monsieur, pointing out that she was not the one who had received the application form that, once again, was never produced in the Court record.

[46]    The evidence does not convince the Court that Madame was really involved with the inscription of X for April 26, 2016. It could have been arranged by Monsieur later on in Madame's absence. There is no evidence as to when the unseen application was actually filed with the daycare center, if it ever was. Moreover, the letter dated November 28, 2017, signed by someone who was not called to testify, was obviously obtained by Monsieur after the filing of the present applications in revocation in the context of the present litigation.

[47]    Another fact that raises doubts in the mind of the Court with respect to Monsieur's version of the facts that Madame was only to travel to Jordan for some 45 days is why did Monsieur keep the cellular telephone that he claimed to have made available to Madame while she was living in Canada? Why didn't he allow Madame to keep her cellular for the alleged month and a half trip as it made access to his wife and daughter far easier?

[48]    Such a behaviour is far more plausible and consistent with Madame's version of the facts that she was leaving permanently with X and with Monsieur's full knowledge and consent[15].

[49]    At the hearing, it became clear that Monsieur was using the international arrest warrant to force Madame to relinquish the exclusive custody of X to him as he concluded the hearing by stating that he would drop the charges against Madame as soon as she surrendered the child to him in Canada. The problem is that Madame cannot even contemplate travelling to Canada without risking to be arrested on her way there.

## 2.    ISSUES IN DISPUTE

[50]    The Court must determine whether Madame has met the requirements of articles 345 and following of the *Code of civil procedure* that would warrant the revocation of the Custody Judgment and of the Divorce Judgment.

[51]    In so doing, the Court shall also address the validity of the notifications of the Originating Applications made by email that eventually led to the aforesaid judgments rendered by default against Madame.

## 3.    ANALYSIS

[52]    The lawyer for Madame argued that the notification of the two Originating Applications on April 3rd and June 2nd, 2017, made by emails sent to her client were invalid as they did not respect the provisions of articles 494 and following of the *Code of Civil Procedure* ("**C.C.P.**") that govern International Notifications.

[53]    Articles 494, 495 and 496 C.C.P. read as follows:

**494.** In States party to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, made at The Hague on 15 November 1965, international notification is made in accordance with the Convention, which is reproduced in a schedule to this Code and has force of law in Québec.

In States not party to the Convention, notification is made as provided for in Book I or in accordance with the law in force in the place where the notification is made. The court, on request, may authorize a different method of notification if it is required by the circumstances.

The certificate of notification is sent to the notifying party through the same channels as those used to send the request for notification.

**495.** If it is established that no certificate of notification was received within six months after an originating application was sent to a foreign State for notification in that State according to a method recognized by the law of that State for the notification of pleadings from abroad, despite reasonable efforts to secure the certificate through the competent authorities of the foreign State, the court may render judgment against the defendant.

A party against which a default judgment is so rendered following failure to answer the summons or defend on the merits may, within one year after the judgment date, apply for the revocation of the judgment if it can show that, by no fault of its own, it did not become aware of the proceeding in sufficient time to file a defence or to exercise a recourse against the decision, and if the grounds raised in its defence do not appear completely unfounded.

**496.** The Minister of Justice, on a request received by the Government through diplomatic or consular channels, may direct a bailiff to notify a pleading from a foreign State to a person in Québec.

The pleading to be notified must be certified by an officer of a court of justice of the place from which it originates. If it is not in French or English, it must be accompanied by a certified translation, and the certificate of notification must state that a translation is attached to the notified pleading.

The notifying party pays the notification costs in advance or undertakes to reimburse them, unless otherwise provided by an international commitment binding on Québec.

[Emphasis added]

[54]    Article 490 C.C.P. stipulates that if a defendant has no domicile, residence or establishment in Québec in the context of a legal dispute that was seized by a Québec court, that person shall have 30[16] days to answer the legal proceedings:

**490.** Where a Québec court is seized of a dispute that involves a foreign element and the defendant has no domicile, residence or establishment in Québec, the latter has 30 days to answer the summons and the parties have three months from the date on which the originating application is served to file a case protocol; these time limits may be shortened if the parties consent or if, in an urgent situation, the judge so orders.

[Emphasis added]

[55]    Madame's lawyer pointed out to the Court that Monsieur obtained on May 2, 2017 the default Custody Judgment before the expiry of the statutory 30-day legal delay that would have expired on May 3, 2017 by taking into consideration the validity of the highly contested notification by email that was made on April 3rd, 2017 (article 83 C.C.P.)[17].

[56]    With respect to the Divorce Proceedings, the alleged unlawful email notification was made on June 2, 2017 and yet, Monsieur's lawyer filed an "*inscription pour jugement*

*ex parte*" on June 26, 2017, again before the expiry of the 30-day statutory delay granted to Madame to answer the Application for divorce.

[57]    The Court file revealed that Monsieur's lawyer filed the inscription for judgment *ex parte* not only before the expiry of the 30-day delay to answer the summons, but he also failed to follow the procedure set out at article 175 C.C.P. that reads as follows:

> **175.** <u>If the defendant fails to answer the summons</u> or to file a defence within the time limit set in the case protocol and the plaintiff so requires, <u>the court clerk sets the case down for judgment</u>. If the defendant fails to attend the case management conference, the case is set down for judgment on an order of the court.
>
> In such instances, the plaintiff must file the exhibits and the plaintiff's own affidavit with the court office.
>
> [Emphasis added]

[58]    On that specific issue, the Court shares the opinion of Mr. Justice Serge Gaudet in *Omega Laboratories Ltd. c. Claris Lifesciences Ltd.*[18]:

> [17] En matière d'inscription pour défaut, il y a une différence entre la procédure qui était prévue à l'ancien *Code de procédure civile* et celle prévue dans le Code actuel.
>
> [18] Selon l'article 192 de l'ancien Code, lorsque le défendeur ne comparaissait pas dans le délai prévu, le *demandeur* pouvait inscrire la cause pour jugement par défaut. Par ailleurs, selon l'article 150 de l'ancien Code, le défendeur pouvait comparaître même après l'expiration du délai, tant que l'inscription pour jugement par défaut n'avait pas été produite au dossier par le demandeur. Ce n'est donc que si le défendeur voulait comparaître après la production au dossier de l'inscription du demandeur qu'il devait être autorisé à le faire par le juge ou le greffier, du moins lorsque la partie adverse refusait d'y consentir (art. 151 ancien C.p.c.).
>
> [19] **Selon le Code de procédure actuel, le demandeur, lorsqu'il constate le défaut du défendeur de répondre, ne peut pas inscrire lui-même l'affaire pour que jugement soit rendu par défaut, plutôt il demande au *greffier* de procéder à cette inscription**. Le premier alinéa de l'article 175 C.p.c est clair à cet égard :
>
> > L'inscription pour jugement <u>est faite par le greffier</u> si le défendeur est en défaut de transmettre sa réponse à l'assignation (…) et <u>que le demandeur le requiert</u> (…).
> >
> >        (Nous soulignons)
>
> [20] En accord avec cette disposition, le formulaire établi par le Ministère de la Justice à cet égard (SJ-1102), de même que le modèle se trouvant dans le *Formulaire de procédure civile* de Francine Payette, indiquent que le demandeur qui constate le défaut de répondre du défendeur doit requérir du greffier que celui-ci procède à l'inscription afin d'obtenir jugement par défaut[19]. **Le demandeur ne peut plus inscrire directement lui-même**[20].
>
> [21] Il s'agit d'une distinction qui peut sembler subtile mais qui a son importance car **le greffier, avant de procéder à l'inscription, doit constater que la demande d'inscription du demandeur est bien fondée. Si celle-ci est prématurée ou irrégulière, le greffier ou le tribunal peut la radier d'office** (art. 176 C.p.c.). **Cette manière de procéder favorise la stabilité des jugements en empêchant que des jugements par défaut ne soient rendus de manière irrégulière, ce qui peut mener à des procédures en rétractation de jugement**[21].
>
> [Bold emphasis added]

[59]    The Minister of Justice made the following comments with respect to article 175 C.C.P.:

> Cet article reprend la règle du droit antérieur selon laquelle il revient au demandeur de requérir l'inscription pour jugement lorsque le défendeur n'a pas respecté les

obligations qui lui incombent en début d'instance, mais il fait les adaptations qui s'imposent, compte tenu de la nouvelle procédure. <u>Ainsi, le demandeur requerra l'inscription si le défendeur n'a pas répondu à l'assignation</u> ou s'il n'a pas produit sa défense, dans le délai prévu par le protocole. <u>Cependant, l'inscription **devra** être faite sur ordre du tribunal si le défendeur était absent lors de la conférence de gestion</u>.

L'article 180 vient préciser que le demandeur doit donner un préavis de cinq jours avant qu'il ne soit procédé à l'instruction, sauf dans le cas d'un défaut de répondre à l'assignation.

[Emphasis added]

[60]    The Court understands that the provisions of article 175 C.C.P. aim, *inter alia*, at allowing the court clerk the opportunity to verify whether the inscription was filed regularly or not. Had this been done here, the Court believes that the inscription for judgment *ex parte* would have been rejected as a having been filed prematurely.

[61]    With all due respect, the Court does not share the view of Monsieur's lawyer that there was no harm by making such an inscription for judgment *ex parte* in anticipation of an upcoming default as long as the date of presentation is after the expiry date. An inscription for judgment by default or *ex parte* may only be filed in the Court record in accordance with article 175 C.C.P. after the defendant is in default to answer to the summons or to file its contestation.

[62]    Aside from the issue of the notification by email, it was therefore based on an irregular and premature inscription for judgment *ex parte*[22] that Monsieur was able to obtain the default Divorce Judgment.

[63]    Moreover, the Court noted in both Court files the absence of any credible and reliable proof of service of the Originating Applications other than a photocopy of the emails themselves that only refer to an attachment file in pdf format. There is no evidence that the emails were actually sent and received by the recipient and, more importantly, there is no evidence of the documents that were actually accompanying the emails, including the judgments authorizing the special mode of service by email.

[64]    The Court is of the view that the proof of service by email filed by Monsieur's lawyer in both court files did not meet the requirements of article 134 C.C.P. that stipulates:

134. <u>Notification by a technological means is proved by the transmission slip or, failing that, by an affidavit of the sender</u>.

<u>The transmission slip must set out the nature of the document, the court record number, the names and contact information of the sender and the addressee, and the place, date, hour and minute of sending</u>; unless the document was sent by a bailiff, <u>the transmission slip must also contain the information needed to enable the addressee to make sure that the entire document was sent</u>. The transmission slip is filed with the court office only if a party so requests.

[Emphasis added]

[65]    Therefore, the Court also finds that the two judgments that are presently attacked by Madame were tainted with significant irregularities not to mention the issue of the contested notifications by email.

### 3.1 The International Notification (articles 494 and following C.C.P.)

[66]    The first paragraph of article 494 C.C.P. stipulates that an international notification is made in accordance with the "*Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*", made at The Hague on 15 November 1965 (the "**Convention**"), which is reproduced as a Schedule I to the *Code of civil procedure*.

[67]    Article 1 of the Convention mentions that in civil or commercial matters, where a judicial or extrajudicial document must be transmitted for service abroad (i.e. outside of Canada), the notification must be made to the person in accordance with its provisions if the addressee or recipient is in one of the States that signed and that are party to the Convention.

[68]    It is important to point out that the Convention does not apply if the address of the recipient is not known[23].

[69]    Therefore, knowledge by the sender of the recipient's address abroad is highly relevant.

[70]    Canada is a party to the Convention, but Jordan is not.

[71]    However, the second paragraph of article 494 C.C.P. covers the situation for States that are not party to the Convention, like Jordan:

> 494. […]
>
> In States not party to the Convention, notification is made as provided for in Book I or in accordance with the law in force in the place where the notification is made. The court, on request, may authorize a different method of notification **if it is required by the circumstances**.
>
> [Emphasis added]

[72]    In light of the foregoing, the Court understands that where a foreign State is not party to the Convention, the notification is made in accordance with the applicable provisions of Book I[24] or in accordance with the law in force in the place where the notification is supposed to be made, in this instance Jordan.

[73]    But the second paragraph of article 494 C.C.P. also specifies that the Court, on request, may authorize a different method of notification *if it is required by the circumstances*. It is interesting to point out that the expression "*If required by the circumstances*" is also found in article 112 C.C.P.

[74]    In the present instance, Monsieur's lawyer clearly decided to rely on the provisions of Book I by seeking the authorization to notify by email although he erroneously referred to article 138 dealing with the notifications by public notice in both of his applications.

[75]    This did not relieve Monsieur however from respecting the provisions of articles 121 and 494 (second paragraph) C.C.P.

[76]    In the present instances, given the nature of the legal proceedings instituted against Madame, the Court is of the opinion that both Originating Applications were governed by the provisions of article 121 C.C.P. that call for the service of an originating application on the addressee personally:

> **121.** Service of an originating application must be made on the addressee personally if the addressee is 14 years of age or older and the application pertains to their personal integrity, status or capacity. The same applies if the addressee is imprisoned or otherwise confined against their will, or if their true identity is unknown or uncertain.
>
> [Emphasis added]

[77]    With respect to that article, the Minister of Justice made the following commentary:

> Cet article précise les cas où la **signification** d'une demande introductive d'instance **doit être faite en mains propres**. Ce sont des situations où l'intégrité, l'état, la capacité ou la liberté des personnes est en jeu. L'article reprend un certain nombre de règles éparses dans l'ancien code et les regroupe au chapitre de la notification. Compte tenu de la nature particulière de l'outrage au

tribunal, l'obligation de signifier en mains propres l'ordonnance portant citation à comparaître en un tel cas demeure exprimée à l'article 60 du Code.

[Emphasis added]

[78]    Article 110 C.C.P. specifies that when a notification is made by a court bailiff, it is called "*service[25]*" as opposed to notification:

> **110.** Notification may be made by any appropriate method that provides the notifier with proof that the document was delivered, sent or published. Such methods include notification by court bailiff, by mail, by delivery, by technological means and by public notice.
>
> **If the law so requires, notification is made by a court bailiff, in which case it is called service**.
>
> Whatever the method of notification used, a person who acknowledges receipt of the document or admits having received it is deemed to have been validly notified.
>
> [Emphasis added]

[79]    In light of the foregoing, the Court finds that Monsieur's lawyer had to comply with the above mentioned legal provisions and proceed with the "service" of the two Originating Applications upon Madame personally (*en mains propres*), therefore by bailiff or the equivalent in Jordan unless the circumstances required a different form of service or notification. The Court believes that the onus to satisfy the authorizing judge that an alternate form of service or notification of an originating application is required rests upon the applicant who must state it in sufficient detail in its application for special mode of service. [Emphasis added]

[80]    In the present instances, the prescribed form of service was not followed.

[81]     The Court noted that no attempts were even made by Monsieur to serve his Originating Proceedings to Madame personally despite the serious consequences that entailed her failure to answer the same, especially if she failed to understand their content due to the language used.

[82]    Monsieur chose to file two applications for special mode of service by email based on article 138 C.C.P., which again is the wrong article as it only pertains to public notices.

[83]     In all likelihood, Monsieur's lawyer relied on article 112 C.C.P. which reads as follows:

> **112. If required by the circumstances**, the court, on an informal request, authorizes notification of a pleading otherwise than as provided for in or outside the hours prescribed by this chapter; in such a case, the court determines how notification is to be proved. **The decision of the court is recorded on or attached to the pleading**.
>
> The authorization of the court may be obtained in the district where the notification is to be made, the district of the court that is seized of the matter or the district of the notifier's residence or, for service of a notice of appeal, in the district where the judgment in first instance was rendered.
>
> The court clerk may exercise the powers conferred on the court with respect to notification, except as regards the notification of pleadings in personal integrity, status or capacity matters.
>
> [Emphasis added]

[84]    The Court has reviewed the two applications that both sought the service of the Originating Applications by email at the following address *[...]@yahoo.com*.

[85]    In both applications, Monsieur essentially justify his conclusions on the following facts:

« 4. **L'adresse de la défenderesse en Jordain(sic) n'est pas très précise**, **de sorte que sera très difficile pour la faire signifier en Jordanie**; »

« 5. Le demandeur garde des contacts avec la défenderesse via son courriel : *[...]@yahoo.com* qu'elle consulte quotidiennement, tel qu'il appert de copies d'exemple de ces contacts communiquée(sic) comme pièce P-3; »

« 6. **Il sera impossible au demandeur de procéder à la notification de sa demande pour garde d'enfant et une ordonnance de sauvegarde à la défenderesse**, **sans l'autorisation du tribunal** en lui permettant la notification de cette procédure à la défenderesse par courriel à son adresse courriel : […] »

[Emphasis added]

[86]     In the application for special mode of service filed later on in the Divorce Proceedings, there was an additional mention that the authorization to serve by email had already been granted in the Custody Proceedings.

[87]     The applications for special mode of service do not refer at all to articles 494 and following C.C.P. that also find application herein given the fact that the service upon Madame had to be made in a foreign country and despite the fact that Jordan is not a party to the Convention given the second paragraph of article 494 C.C.P. that refers to Book I.

[88]     By choosing to rely on the provisions of Book I to seek a special mode of service in a foreign country, the Court reiterates its view that Monsieur was nevertheless bound by the words "*If required by the circumstances*" found at the very beginning of article 112 C.C.P. and in the second paragraph of article 494 C.C.P., which means that the authorization to serve or to notify a pleading *otherwise than as provided for* in Chapter VI[26] had to be warranted or justified by taking into consideration the original method of service or of notification determined by the legislator.

[89]     In other words, if the legislator determined that originating applications governed by articles 110 and 121 C.C.P. must be served on the addressee personally, the party that seeks to proceed differently must satisfy the authorizing judge that the alternate method of service or notification proposed is required under the circumstances of that case.

[90]     The mere convenience and/or an economic factor are not necessarily sufficient by themselves to warrant depriving the addressee or the recipient of his or her fundamental right to be served personally with the type of originating proceeding that interest us herein, especially when the proceedings will have an incidence on the personal integrity, status or capacity of that person.

[91]     There must be compelling reasons to digress from the required form of service retained by the legislator under such circumstances.

[92]     The Court finds that in the present instances, Monsieur, who executed sworn declarations in support of his two applications for special mode of service, mislead the two judges who were called upon to relieve him from having to proceed to the service of his two Originating Applications to Madame personally and who authorized the notification by email instead.

[93]     The Court believes that in all likelihood, had those judges been apprised of all relevant facts herein (as the Court is presently aware), those authorizations would not have been granted as requested given the fact that they involved the service of originating applications governed by article 121 C.C.P. in a foreign country.

[94]     The evidence adduced at the present hearing revealed that, contrary to the allegations contained in his sworn declarations, Monsieur was perfectly aware of the exact address where Madame lives since her departure from Canada on November 2, 2015 as it was the same address where she has lived since her birth and the same

address where Monsieur visited Madame on more than one occasion, including on his own wedding day which was celebrated there.

[95]    The allegations made by Monsieur in paragraphs 4 and 6 of his application for special mode of service in the Custody Proceedings[27] that as Madame's address in Jordan was not "*very accurate*[28]", it would be "*very difficult[29]*" to serve the proceedings upon Madame in Jordan and that it would be "*impossible*" to proceed with the service upon Madame of the Originating Applications (Custody and Divorce) were plainly misleading, if not plainly false.

[96]    At all relevant times, Monsieur was fully aware of Madame's exact address in Jordan even though he managed to successfully convince the two authorizing judges otherwise.

[97]    At the hearing, Monsieur went as far as to claim that he did not have Madame's address at the time since he had not kept a copy of the Consent Letter that he had filled out himself to authorize Madame to travel to Jordan with X, bearing in mind that he wrote himself Madame's exact address in Amman on the said document. Monsieur added that even if once in Amman, he could find his way to Madame's house, he did not know the exact address.

[98]    Far more troubling is Monsieur's failure to reveal in his two applications that Madame had already initiated legal proceedings in Jordan in connection with their daughter's custody and the alimony that she was seeking for herself and for X.

[99]    Monsieur also failed to reveal that he had retained counsel in Jordan to represent him in those legal proceedings and that his Jordanian lawyer was in contact with Madame's own lawyer in Amman and that they add access to her exact address.

[100]    Monsieur also failed to reveal to the authorizing judge on April 3rd, 2018 that on March 21, 2017, namely 14 days prior to seeking the first authorization to proceed with the notification of the Custody Originating Application by email based on the fact that "*Il sera impossible au demandeur de procéder à la notification de sa demande pour garde d'enfant et une ordonnance de sauvegarde à la défenderesse, sans l'autorisation du tribunal en lui permettant la notification de cette procédure à la défenderesse par courriel à son adresse courriel*", Monsieur had caused a letter of demand written in Arabic (with an English translation) to be <u>served upon Madame at her address by a notary public hired by Monsieur's Jordan lawyer</u> for the purpose of warning Madame of impending legal proceedings if she refused to surrender the child to him in Canada[30]. [Emphasis added]

[101]    Despite that the service minutes of the letter of demand **P-5** leave no doubt as to Monsieur's knowledge of Madame's "exact" address and of the possibility of serving legal proceedings to her "*en mains propres*" in Amman by way of a "*notarial notification*", incredibly, Monsieur insisted during his testimony that his Jordan lawyer did not have Madame's address and that, in any event, he never asked his lawyer if the latter could provide him with her address, an address which Monsieur already have, in the Court's opinion.

[102]    With all due respect, the Court does not believe Monsieur's testimony on its most important aspects.

[103]    Monsieur had the address of Madame in Jordan, he had a lawyer representing his interests in Jordan in the context of the legal proceedings initiated by Madame and his Jordan lawyer knew the address of Madame and was in contact with Madame's Jordan lawyer. On more than one occasions, commencing on March 21, 2017, Monsieur had absolutely no qualms <u>serving upon Madame</u> and other members of her family all living at the same address, <u>via a notary public,</u> letters of demand and warnings all drafted in Arabic with English translations for the most part. [Emphasis added]

[104]    When it came to the most important legal documents affecting Madame's fundamental rights, Monsieur resorted to proceed to their notifications by email[31] of the Originating Applications drafted in French, knowing full well that Madame would have great difficulties understanding those important legal documents that ultimately would serve Monsieur to have an international arrest warrant issued against his ex-wife via Interpol.

[105]    Monsieur also failed in his attempts to convince the Court that Madame was perfectly at ease and that she understood very well the French language. The preponderance evidence convinced the Court of the contrary. Madame did not understand the exact nature nor the content of the legal proceedings emailed to her in the French language, including the judgments rendered herein that were both in the form of drafts submitted to Justices Alary and Labelle who signed them.

[106]    Again, knowing very well that those judgments were destined to be sent to Jordan to a person whose mother tongue was Arabic with a working knowledge of English only, how difficult would it have been to prepare those two-page documents in the English language to start with?

[107]    The Court is even more appalled by Monsieur's untoward tactics when the evidence revealed that he had the May 2, 2018 Custody Judgment translated in English[32] for the police authorities, according to his testimony.

[108]    Yet, despite Madame's specific request to Monsieur's lawyer to provide her with an English translation of the documents that he was emailing to her all in French, the lawyer even failed to send her that English translation of a judgment that was drastically affecting her rights vis-à-vis her daughter, the lawyer preferring to respond:

> The official language here is French.
>
> If you don't understand get a translator.[33]

[109]    Must we remind everyone that the cardinal rule of article 1375 of the *Civil Code of Quebec* with respect to the good faith, governs all concerned, including lawyers who are also officers of the Court:

> 1375. The parties shall conduct themselves in good faith both at the time the obligation is created and at the time it is performed or extinguished.

[110]    In the Court's opinion, a lawyer who is aware of relevant facts that would definitely have a bearing on the decision that an authorizing judge is called to make at his or her request on an *ex parte* basis, has the duty to disclose frankly, honestly and fully all relevant facts.

[111]    Sadly, this fundamental rule was clearly not followed in the present instances that enabled Monsieur to obtain *ex parte* the two judgments on the applications for special mode of service, the whole to the detriment and prejudice of Madame's fundamental rights.

[112]    The evidence also leads the Court to believe that in all likelihood, Monsieur's lawyer never sent to Madame a copy of the applications for special mode of service bearing the handwritten judgments on their first page that authorized them as required by article 112 C.C.P.

[113]    Under such circumstances, how could Madame be apprised of the reasons given by Monsieur to deprive her of her right to be served "*en mains propres*" in accordance with article 121 C.C.P.?

[114]    The relevant articles of the *Code of civil procedure* dealing with the revocation of judgments are the following:

**345.** <u>A judgment may, on a party's application, be revoked by the court that rendered it if letting the judgment stand would tend to bring the administration of justice into disrepute.</u> The judgment may be revoked, for instance, if fraud was committed by another party, if the judgment was based on false exhibits or if the production of decisive exhibits was prevented by superior force or by the act or omission of another party.

As well, a judgment may be revoked if

(1) the judgment adjudicated beyond the conclusions set out in the application or did not rule on one of them;

(2) no valid defence was produced in support of the rights of a minor or of a person of full age under tutorship or curatorship or for whom a protection mandate has been homologated;

(3) a ruling was made on the basis of invalid consent or following an unauthorized tender that was subsequently disavowed; or

(4) evidence was subsequently discovered that would probably have led to a different judgment if the party concerned or its lawyer had become aware of that evidence in sufficient time, although they acted with due diligence.

**346.** <u>A party against which a default judgment has been rendered following failure to answer the summons</u>, attend the case management conference or defend on the merits <u>but that was prevented from doing so owing to</u> fraud, surprise or <u>any other cause considered sufficient</u> may apply to the court that rendered the judgment for the revocation of the judgment and the dismissal of the original application.

The application for revocation must contain the reasons justifying the revocation as well as the grounds of defence raised against the original application.

**347.** <u>An application for revocation must be served on all parties to the proceeding within 30 days after the day on which the cause preventing the party from filing a defence ceased to exist, or after the day on which the party became aware of the judgment</u>, evidence or fact that constitutes grounds for the revocation. In the case of a minor, the 30-day period only begins to run as of notification of the judgment after the person reaches full age.

The application for revocation must be presented before the court within 30 days after service, as if it were an application in the course of a proceeding. It cannot be presented if more than six months have elapsed since the judgment.

These are strict time limits.

**348.** If, when the application for revocation is presented, the reasons given are found to be sufficient, the parties are restored to their former state and the court stays execution of the judgment; it continues the original proceeding after agreeing with the parties on a new case protocol.

If circumstances permit, the court may decide the application for revocation and the original application at the same time.

[Emphasis added]

[115]     The second paragraph of article 495 C.C.P. which is also applicable herein stipulates:

495. […] <u>A party against which a default judgment is so rendered following failure to answer the summons</u> or defend on the merits <u>may, **within one year after the judgment date**, apply for the revocation of the judgment if it can show that, by no fault of its own, it did not become aware of the proceeding in sufficient time to file a defence</u> or to exercise a recourse against the decision, <u>and if the grounds raised in its defence do not appear completely unfounded</u>.

[Emphasis added]

[116]    The lawyer for Monsieur essentially argued that Madame's Applications in revocation of the Custody and the Divorce Judgments should be dismissed for having been filed outside the legal delay of 30 days. The Court believes that in the present instance the one-year delay of article 495 C.C.P. applies.

[117]    Upon reading articles 494 and following C.C.P. dealing with International Notification, the legislator has extended the standard legal delays for persons living outside of Canada that are parties to legal proceedings instituted against them in Québec. Madame finds herself in such a situation.

[118]    With respect to the computation of the applicable legal delay, the position of Monsieur's lawyer is that legal delays started to run immediately upon receipt of the emails by Madame based on the premise that:

-    the notifications by email were valid since they were authorized by judges of the Superior Court with judgments that were never appealed by Madame; and

-    Madame understood French and therefore, as she was able to read upon receipt the Originating Applications and the Custody and Divorce Judgments, she was able to understand their content immediately.

[119]    Moreover, despite the critiques that could be raised against Monsieur with respect to "irregular" form of service of the two Originating Applications, the end result would have been the same, namely that Madame received those proceedings.

[120]    In other words, even if Monsieur managed to "successfully bypass" the required form of service en mains propres with two Court approvals based on false and misleading facts, the mere fact that the emails reached Madame would be sufficient to validate the entire legal process and therefore prevent Madame from ever being able to present her defence to those legal proceedings that resulted with an international arrest warrant presently in force issued against her by Interpol at the behest of Monsieur.

[121]    Even if this arrest warrant is not executory in Jordan, it nevertheless prevents Madame from travelling outside of Jordan where she will be susceptible of being arrested and detained at any time.

[122]    Given the application of the one-year delay stipulated in the second paragraph of article 495 C.C.P., the filing of the two Applications in revocation of judgments made in November 21, 2017 is not time barred.

[123]    Based on the preponderant evidence, the Court also finds that Madame is entitled to obtain the revocation of the Custody Judgment and of the Divorce Judgment given to start with that prima facie, she has a valid and serious defence to oppose to Monsieur.

[124]    Moreover, the Court is of the opinion that due to the untoward and illicit manoeuvres of Monsieur and of his lawyer, Madame did not become aware of the proceedings in sufficient time to file a defence by no fault of hers as she did not understand any of the proceedings drafted purposely in French while all other demands letters, warnings, etc. were drafted in Arabic with an English translation.

[125]    Furthermore, not only failing to grasp the content and the importance of the proceedings[34], Madame, having the benefit of legal counsel in Jordan in connection with legal proceedings initiated by her against Monsieur who was also represented by counsel, had been advised, rightly or wrongly, that service of legal proceedings by email was not a legal procedure in Jordan and that she should disregard the same.

[126]    It is only when apprised of the existence of the international arrest warrant issued by Interpol against her that she made appropriate verifications in Canada to realize the

existence of the two judgments and of their drastic and adverse impact on her rights and freedom and those of her young daughter.

[127]   Is Madam totally blameless in this unfortunate matter? Of course not.

[128]   In retrospect, it is easy to reproach her failure to get an appropriate translation of the legal proceedings that she presumably received even if Madame testified that she did not have the financial resources to do so and her lawyer did not understand French either.

[129]   Madame nevertheless sought from Monsieur's lawyer, at the very first opportunity, an English translation of the first legal proceeding that she did not understand. Monsieur's lawyer wrote back in English that French was the official language in Québec and to get the document translated if she did not understand it. Knowing Madame's predicament which would obviously require her additional time to just be able to understand those legal proceedings in French, the lawyer did not lose any time to get judgment by default against her before the expiry of the legal delay to answer the summons.

[130]    This leads the Court to broach the issue related to the dilemma between the principle of the stability of the judgments when opposed to the cardinal rule of *audi alteram partem*.

[131]   In the case of *Nationwide Advertising Service inc.*[35], Mr. Justice Albert Mayrand wrote the following comments on behalf of the panel of the Court of appeal who granted the appeal of a judgment that refused to receive a motion in revocation of a judgment:

> Il faut trouver un juste équilibre entre deux principes qui s'affrontent: celui de la stabilité des jugements rendus et celui du droit à une défense entière.
>
> <u>Dans les circonstances de cette cause, il me paraîtrait excessif de sanctionner l'imprudence de la défenderesse par la privation définitive de son droit d'opposer une défense à l'action intentée contre elle.</u>
>
> [Emphasis added]

[132]   In *Nelson Excavation inc. v. JVS Spiral Design Ltd.*[36], Mr. Justice Robert Legris was called upon to rule on a motion in revocation of judgment involving the service of a legal proceeding drafted in French, a language that the addressee living in Vancouver was not familiar with. Justice Legris discussed the dilemma raised by that question that caused a clash between the principle of the stability of the judgments versus the rule *audi alteram partem*.

[133]   The Court wholeheartedly endorses the following comments filled with wisdom of Justice Legris:

> [4] Le tribunal ne peut souscrire à l'argument voulant que l'usage d'une langue officielle de ce pays constitue «*an entrapment*», d'autant plus que le président de la défenderesse est ingénieur et que la défenderesse fait affaire dans plusieurs pays du monde. Par ailleurs, la défenderesse avait déjà auparavant réservé les services d'un avocat de Vancouver pour mettre la demanderesse en demeure de lui payer quelque 15 000 $, solde du prix de vente de l'appareil.
>
> [5] <u>Ceci dit, reste à résoudre la question fondamentale de ce débat, car la réception d'une procédure dans une langue inconnue de la défenderesse peut, à la rigueur, être vue comme une situation où elle est privée de produire sa défense pour une cause jugée suffisante.</u>
>
> [6] <u>Les principes de la stabilité des jugements et la règle *audi alteram partem* s'opposent ici avec acuité.</u> Lequel des deux est le plus cher aux yeux du législateur?
>
> [7] <u>De l'avis du soussigné, c'est la règle *audi alteram partem*, et voici pourquoi.</u>
>
> [8] D'une part, le législateur a adopté un code complet dont la très grande majorité des dispositions ont pour but de mettre en œuvre cette unique règle dans les diverses étapes de la vie procédurale.

[9] D'autre part, cette règle est l'une des seules à qui tant le législateur que nos tribunaux ont donné le titre de règle de justice naturelle, et ce, depuis des siècles, tant en ce que nous tenons du droit public que du droit privé. Les tribunaux inférieurs, par exemple, peuvent commettre des erreurs de droit et de fait, mais ils ne peuvent échapper à cette règle. Elle serait donc quelques fois, si l'on peut dire, plus importante que le contenu de la décision finale elle-même. En ce qu'elle peut avoir de relatif, rappelons ici que le montant au litige dépasse les 300 000 $.

[10] Ce qui nous amène évidemment au principe de la stabilité des jugements. Il faut convenir que ce principe est davantage relatif. D'un jugement, il peut y avoir appel, et la Cour d'appel peut autoriser les appels hors délai (art. 523 C.p.c.). Il peut aussi y avoir rétractation de jugement pour des motifs tout aussi subjectifs, c'est à dire reliés à la personne même du retardataire. Et que dire des actions «en nullité de jugement»?

[11] Bref, ce ne sera que quand la règle *audi alteram partem* aura été épuisée qu'on pourra réellement parler de stabilité des jugements. Cette maxime en effet est l'élément essentiel d'un jugement qui engendrera sa stabilité.

[Emphasis added]

[134]    The Court shall not condone the untoward and unfair manoeuvres used by Monsieur and by his lawyer, made in total disregard of the applicable laws and of the judicial process, to obtain the two authorizations for special mode of service by email without disclosing to the authorizing judges in a full and frank manner all relevant facts (let alone by making false sworn allegations) and to subsequently obtain by default the Custody and the Divorce Judgments without even respecting the applicable rules of procedure, the whole in clear violation of Madame's most fundamental rights, by dismissing outright the applications in revocation of judgments of Madame.

[135]    As previously indicated, the Court is satisfied that under the very particular circumstances of the case at hand, Madame has met the requirements of Article 495 C.C.P. for the revocation of the Custody and Divorce Judgments.

[136]    The Court would also add, in light of the very particular circumstances described above, that it has no hesitation to conclude that letting the Custody Judgment and the Divorce Judgement stand would tend to bring the administration of justice into disrepute[37].

[137]    Furthermore, the Court is also satisfied that Madame was prevented from answering to the two summonses herein for causes that it considers sufficient within the ambit of article 346 C.C.P. in light of the preponderant evidence adduced at the hearing.

[138]    It is in the interest of justice that Madame be heard and be able to present her contestation to Monsieur's Custody Proceedings and Divorce Proceedings.

[139]    In closing, given the fact that both cases are intimately linked one to the other, it is in the interest of justice that the Court exercises its judicial discretion under articles 49 and 210 C.C.P., and orders the consolidation of the two Court files so that they may be dealt with and heard together at the same hearing, especially since the conclusions sought in the Custody Proceedings are also found in the Divorce Proceedings.

**WHEREFORE, THE COURT:**

- **In the Court case 540-04-013860-173**

[140]    **GRANTS** the Application for revocation of a judgment of Defendant Mrs. D. A.;

[141]    **ORDERS** the revocation of the judgment rendered on May 2, 2017, by Madam Justice Christiane Alary in the Court file bearing number 540-04-013860-173 (the "**Alary**

Judgment");

[142]    **ORDERS** that the parties herein be restored to their former state before the Alary Judgment was rendered;

[143]    **STAYS** the execution of the Alary Judgment;

[144]    **EXTENDS** the delay for the filing of a joint declaration by the parties stating that the case is ready for trial and a request for setting down for trial and judgment until May 31, 2019;

-    **In the Court case 540-12-021501-176**

[145]    **GRANTS** the Application for revocation of a judgment of Defendant Mrs. D. A.;

[146]    **ORDERS** the revocation of the judgment rendered on August 8, 2017, by Mr. Justice Pierre Labelle in the Court file bearing number 540-12-021501-176 (the "**Labelle Judgment**");

[147]    **ORDERS** that the parties herein be restored to their former state before the inscription for judgment *ex parte* filed on June 27, 2017 leading to the Labelle Judgment;

[148]    **STAYS** the execution of the Labelle Judgment;

-    **In the Court cases 540-12-021501-176 and 540-04-013860-173**

[149]    **ORDERS** that the Court file bearing number 540-04-013860-173 be consolidated with the Court file bearing number 540-12-021501-176 in order that they be tried at the same time and determined on the same evidence, and that the evidence in one of the proceedings be used in the other;

[150]    Given the consolidation of the two abovementioned Court files, **ORDERS** the parties herein to file in the Court record a single case protocol as to the future conduct of the consolidated proceedings on or before December 24, 2018;

[151]    **EXTENDS** the delay for the filing of a joint declaration by the parties stating that the case is ready for trial and a request for setting down for trial and judgment until May 31, 2019;

[152]    **THE WHOLE**, with costs against Plaintiff Mr. M. J..


_____
MICHEL A. PINSONNAULT, J.S.C.


M<sup>tre</sup> Fareed Halabi
Attorney for Plaintiff Mr. M. J.


M<sup>tre</sup> Sonia Heyeur
HEYEUR JESSOP
Attorneys for Defendant Mrs. D. A.


Hearing date:        October 3, 2018

---

[1] Hereinafter the "**Custody Proceedings**".
[2] Hereinafter the "**Divorce Proceedings**".

[3] The Application for special mode of service was erroneously based on article 138 of the *Code of civil procedure* that pertains to the notifications by public notice.

[4] **D-1**.

[5] **D-1**.

[6] **D-2**.

[7] **D-3**.

[8] **D-4**.

[9] **P-7**.

[10] **P-8**.

[11] **D-8**.

[12] **P-12**.

[13] **P-5**.

[14] **P-2**.

[15] **D-10**.

[16] Instead of the standard 15-day delay.

[17] **83.** A time limit fixed by this Code, set by the court or agreed by the parties for the performance of an act or of a formality runs as of the act, event, decision or notification that gives rise to the time limit.

A time limit is counted by whole day or, if applicable, by month. If the time limit is expressed in days, the day that marks the start is not counted but the terminal day is. If the time limit is expressed in months, it expires on the day, in the last month, that bears the same calendar number as the day of the act, event, decision or notification having given rise to the time limit; if there is no such calendar number in that month, the time limit expires on the last day of the month.

A time limit expires at 12 midnight on the last day; a time limit that would normally expire on a Saturday or a holiday is extended until the following working day.

[Emphasis added]

[18] 2018 QCCS 833.

[19] F. Payette, *Formulaire de procédure civile*, Wilson & Lafleur, Montréal, édition feuilles mobiles (à jour au 1$^{er}$ novembre 2016), p. 358 et 360-362.

[20] Le Tribunal souligne que la même distinction existe relativement à l'inscription pour instruction et jugement. Alors que l'ancien Code de procédure indiquait que le demandeur devait inscrire lui-même dans le délai spécifié (art. 110.1 de l'ancien *C.p.c.*), le demandeur doit maintenant désormais « *déposer au greffe une demande pour que l'affaire soit inscrite pour instruction et jugement* ». (art. 173 (1) *C.p.c.*, nous soulignons).

[21]  Art. 346 *C.p.c.*

[22] **176** [C.C.P.]. A premature or irregular request for setting down a case may be cancelled by the court or the court clerk, on their own initiative. A request made after the expiry of the time limit prescribed by law or set by the court is inadmissible.

[23] Article 1 *in fine*.

[24] Articles 109 to 140 C.C.P. dealing with the "*Notification of pleadings and documents*".

[25] "*Signification*" in French.

[26] Articles 109 to 140 C.C.P.

[27] Paragraphs 5 and 7 in the Divorce Proceedings.

[28] *Très précise*.

[29] *Très difficile*.

[30] **P-5**.

[31] The authorizations having been obtained under false pretenses.

[32] **P-12**.

[33] **D-2**.

[34] The Court must point out that Monsieur never proved what documents were really notified to Madame with his lawyer's email. It would be difficult to understand the importance of legal proceedings if you are one notified with a notice of presentation as appears from the Court file.

[35] AZ-80122032.

[36] 1997 CanLII 9084 (QC CS).

[37] Article 345 C.C.P.